**Gregory F. DANIEL, M.D., Plaintiff,**

v.

**AMERICAN BOARD OF EMERGENCY MEDICINE, et al., Defendants.**

**Civ. No. 90–1086A.**

United States District Court,
W.D. New York.

Aug. 20, 1992.

Jaeckle, Fleischmann & Mugel, Ralph L. Halpern, J. Edmund de Castro, Jr., of counsel, Buffalo, N.Y., for plaintiff.

Phillips, Lytle, Hitchcock, Blaine & Huber, Robert E. Glanville, of counsel, Buffalo, N.Y., for defendants.

## ORDER

ARCARA, District Judge.

On August 6, 1992, this Court filed an Order adopting Magistrate Judge Leslie G. Foschio's Report and Recommendation on defendants' motions to dismiss.

It has now come to the Court's attention that it misconstrued, in footnote one of the Order, one of the arguments advanced by plaintiff's counsel at oral argument, that is, that defendant Henry A. Thiede, M.D. had waived all objections to the Report and Recommendation. Although the adoption of the Report and Recommendation rendered this argument moot, for purposes of clarity, the original Order is vacated and the Clerk of the Court is directed to file the Amended Order attached hereto.

It is so ordered.

## AMENDED ORDER

ARCARA, District Judge.

This matter was referred to Magistrate Judge Leslie G. Foschio, pursuant to 28 U.S.C. § 636(b)(1)(B), for report and recommendation on defendants' motions to dismiss. Magistrate Judge Foschio filed his Report and Recommendation on February 25, 1992, granting defendants' motions in part and denying them in part. Specifically, he recommended that defendants' motion to dismiss for lack of personal jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(2), be granted without prejudice as to all individually named defendants except Henry A. Thiede, M.D., a New York resident. He also recommended that defendants' motions to dismiss for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1), and for failure to state a claim,

pursuant to Fed.R.Civ.P. 12(b)(6), be denied.

Defendants' have filed objections to those parts of the Report and Recommendation that deny their Rule 12(b)(1) and 12(b)(6) motions. Plaintiff has filed no objections.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. The Court has reviewed the Report and Recommendation, the submissions of the parties, and has heard argument from counsel.[1] Upon *de novo* review, the Court adopts the findings of the Report and Recommendation and orders that defendants' Rule 12(b)(1) and 12(b)(6) motions be denied.

In deciding a motion to dismiss, the court is required to accept plaintiff's allegations as true and to construe those allegations in the light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The complaint will be dismissed only if "it appears beyond doubt" that plaintiff can prove no set of facts which would entitle him or her to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

Applying these principles to this case, the Court finds that it has subject matter jurisdiction and that plaintiff has stated a claim for violations of sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1, 2. The Court also finds that while plaintiff's cause of action for violations of New York's Human Rights Law, N.Y.Exec.Law § 290 *et seq.*, is not as clearly alleged as the anti-

trust claims, and there is a question as to whether defendants are even subject to the law's provisions, at this point in the lawsuit, plaintiff has made sufficient factual allegations to withstand defendant's motion.[2] Defendants' motions are denied for the reasons set forth by Magistrate Judge Foschio in his Report and Recommendation.

It is so ordered.

## REPORT and RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### JURISDICTION

This matter was referred to the undersigned by the Hon. Richard J. Arcara, District Judge, on April 24, 1991 for report and recommendation on any dispositive motions pursuant to 28 U.S.C. § 636(b)(1)(B). This matter is presently before the court pursuant to Defendants' motion to dismiss the amended complaint pursuant to Rules 12(b)(1), (2), and (6) of the Federal Rules of Civil Procedure.

### BACKGROUND

This lawsuit, originally filed on September 25, 1990 in New York State Supreme Court, Erie County, was brought by Plaintiff, an emergency medicine physician, following the American Board of Emergency Medicine's ("the Board") refusal to permit Plaintiff to take its examination to enable him to become certified as a Diplomate in emergency medicine. A Diplomate in emergency medicine is a physician who has fulfilled the prerequisite educational and experience criteria of the Board, along with passing the Board's certification examina-

---

**1.** Defendants made a motion, opposed by plaintiff, to have this Court, in its *de novo* determination, consider an amicus brief by the American Board of Emergency Medicine ("ABEM"). At this stage of the proceeding, however, an amicus brief laying out the effects of this lawsuit on the practice of medicine would be premature. All that is before this Court is a motion to dismiss and therefore its analysis and review are limited to the allegations of plaintiff's complaint. Defendants' motion is therefore denied.

**2.** Defendants assert that the statement in the Report and Recommendation that in order for

plaintiff to be successful on his Human Rights Law cause of action, he must also succeed on his antitrust claims, is now "the law of the case" due to plaintiff's failure to object thereto. *See* Reply Memorandum, at 21. The Court disagrees, and finds that the statement in question was not intended to be a statement of law, but rather a practical statement regarding the reality of inconsistent pleading and what plaintiff would have to prove in order to be successful on the Human Rights claim. Neither the Court nor plaintiff are bound by this particular statement or defendants' interpretation thereof.

tion. Physicians specializing in other medical areas may be certified as Diplomates ("Board-certified") in other disciplines, for example, the American Board of Internal Medicine.

Defendants removed this action to federal court on October 23, 1990. Plaintiff originally asserted causes of action against the Board for violations of the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, and for a violation of the New York State Human Rights Law.

Following the Board's motion for dismissal of the complaint filed on October 25, 1990, Plaintiff filed an amended complaint on February 7, 1991, dropping the causes of action for violations of the due process and equal protection clauses and asserting two new causes of action under theories of antitrust for violations of Sections 1 and 2 of the Sherman Act, and adding the individual board members of the Board as defendants.

On April 5, 1991, Defendants filed a motion to dismiss the amended complaint against all parties for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim on which relief can be granted. Following the filing of briefs, oral argument was held before the undersigned on September 11, 1991.

For the reasons as stated below, I recommend that Defendants' motion to dismiss be GRANTED in part and DENIED in part.

## FACTS

Defendant, the American Board of Emergency Medicine, is a Michigan not-for-profit corporation that certifies Diplomates in the specialty of emergency medicine. The named individual Defendants are either officers or directors of the Board. The Board was established in 1976. At its inception, the Board had two modes of qualification for Diplomate status: (1) the "residency" mode, whereby the physician was required to complete an approved three-year residency training program in emergency medicine, and (2) the "practice track" mode, whereby the physician was required to complete 7,000 hours and 60 months of practice in emergency room medicine, with 24 months of continuing practice. In accordance with its original charter provisions, the Board discontinued the "practice track" mode on June 30, 1988 and now relies exclusively on the residency mode for qualification. In order to become Board-certified, once completing the initial qualification, physicians must pass a certification examination.

Plaintiff, a native of Trinidad, received his Doctor of Medicine degree in May, 1982 from the University of Wisconsin. Following the completion of his medical internship in June, 1983, Plaintiff began a residency in general surgery at the State University of New York at Buffalo. Plaintiff was licensed to practice medicine in New York State in July, 1984. His residency was completed in June, 1986, whereupon Plaintiff joined the emergency medicine department of Sisters of Charity Hospital in Buffalo, New York. In addition to Sisters Hospital, Plaintiff presently holds staff positions in the emergency medicine departments of St. Joseph's Medical Center Hospital in Cheektowaga, New York, and Sheehan Hospital in Buffalo, New York.

Plaintiff filed an application to take the examination given by the Board for qualification as a Board-certified specialist in emergency medicine on July 13, 1988. At the time of his application, Plaintiff had completed the 7,000 hours and 24 consecutive month requirements of the "practice track" mode, however he had only been practicing emergency medicine for 36 months instead of the required 60 months. Plaintiff, in his application, requested the Board to consider his internship hours, his residency hours which included eight months spent in emergency medicine, and that he had completed 5,500 hours of emergency medicine practice within the last two years. See, Affidavit of Benson Munger, Ph.D., dated October 24, 1990.

The Board gave Plaintiff some additional credit based upon Plaintiff's application requests, however, they determined that Plaintiff still fell short of the Board's requirement that a physician complete 60

months of emergency medicine practice prior to June 30, 1988 in order to sit for the examination. After Plaintiff contacted the Board on October 14, 1988 and learned that his application was being denied, he filed a letter with the Board, again requesting that additional hours from his internship and residency be credited to him. He also filed two other letters of support from two physicians with whom he had worked. See, Exhibits to Affidavit of Benson Munger, dated October 24, 1990.

Following review of the application by the Credentials Committee of the Board, on September 20, 1989, Plaintiff's application was again denied. On October 25, 1989, Plaintiff requested a reconsideration by the Credentials Committee. The Board's original decision was affirmed by the Credentials Committee on May 25, 1990. The Board sent Plaintiff a copy of its appeal procedures, however, Plaintiff did not appeal the decision administratively, but instituted this lawsuit on September 25, 1990 asking for declaratory relief, ordering the Board to allow him to take the certification examination, and damages. Plaintiff is not, as a result of any success in this litigation, seeking Diplomate status by court order, but only the opportunity to sit for the Board's certification examination, after which his eligibility for Board Diplomate status may be determined.

## DISCUSSION

■ On a motion to dismiss, the court looks to the four corners of the complaint and is required to accept plaintiff's allegations as true and to construe those allegations in the light most favorable to the plaintiff. See, *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Dacey v. New York County Lawyers' Association*, 423 F.2d 188, 191 (2d Cir.1969), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1819, 26 L.Ed.2d 92 (1970). The complaint will be dismissed only if "it appears beyond doubt" that the plaintiff can prove no set of facts which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Goldman v. Belden*, 754 F.2d 1059, 1065 (2d Cir.1985). This rule "applies with no

less force to a Sherman Act claim...." *McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980). The court is required to read the complaint with great generosity on a motion to dismiss. See, *Yoder v. Orthomolecular Nutrition Institute*, 751 F.2d 555 (2d Cir.1985).

Defendants argue that Plaintiff's complaint should be dismissed for lack of personal jurisdiction over the individual defendants, failure to allege a substantial and adverse impact on interstate commerce, failure to allege a conspiracy within the meaning of Section 1 of the Sherman Act, a failure to identify the relevant product and geographic markets thereby rendering Plaintiff's antitrust claims facially insufficient, Plaintiff's failure to allege that Defendants have achieved, or that there is a dangerous probability that Defendants will achieve, a monopoly in any relevant market, and that Plaintiff has not stated a claim of discrimination in violation of the New York Human Rights Law. I will discuss each of Defendants' arguments in order.

### I. *Jurisdiction*

#### *Lack of Personal Jurisdiction over Individual Defendants.*

■ On a motion to dismiss for lack of personal jurisdiction, the plaintiff has the burden of providing sufficient reliable facts to support the court's exercise of jurisdiction. *Merkel Associates, Inc. v. Bellofram Corporation*, 437 F.Supp. 612 (W.D.N.Y. 1977). Defendants have not disputed that the court has jurisdiction over the Board, as an entity, pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, which states that:

> Any suit, action or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the

district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22.

As the Board mailed an application to Plaintiff in New York and corresponded with Plaintiff by mail and by telephone in New York relating to Plaintiff's request for certification to the Board, the Board can be found to have transacted business within New York. See, *Lanier v. American Board of Endodontics*, 843 F.2d 901 (6th Cir.1988), *cert. denied*, 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988) (contacts with plaintiff relating entirely to plaintiff's request for certification as a Diplomate of the American Board of Endodontics held to be the transaction of business for purposes of exercising jurisdiction over the defendant Board).

■ Defendants argue, however, that there is no personal jurisdiction over any of the nineteen individual defendants, eighteen of whom reside and do business outside of New York, and one defendant, Dr. Thiede, who, according to Defendants, is not a member of the Board's Board of Directors. As Dr. Thiede is a resident of New York State, for purposes of this motion, this court may exercise personal jurisdiction over him. See, *Andros Compania Maritima, S.A. v. Intertanker, Ltd.*, 714 F.Supp. 669, 674, n. 6 (S.D.N.Y.1989) (individual defendant's residence in New York "precluded any possible constitutional impediment to jurisdiction over him").

■ It is well settled that jurisdiction over the individual officers and directors of a corporation cannot be predicated merely upon jurisdiction over the corporation. See, *Weller v. Cromwell Oil Company*, 504 F.2d 927 (6th Cir.1974); *Department of Economic Development v. Arthur Andersen & Co.*, 747 F.Supp. 922 (S.D.N.Y.1990); *Path Instruments International Corp. v. Asahi Optical Co.*, 312 F.Supp. 805 (S.D.N.Y.1970). If the Clayton Act provides jurisdiction over the corporate defendant, the court must look to the long-arm statute of the state where it sits in order to reach an individual defendant in an antitrust suit where he is transacting business. See, *Whylie Eye Care Center v. Vision Service Plain–Central Region, Inc.*, 1991 WL 83835 (N.D.Ill.1991); *Pocahontas Supreme Coal Co., Inc. v. National Mines Corp.*, 90 F.R.D. 67 (S.D.N.Y.1981) (since neither federal antitrust law nor New York law authorized extraterritorial service to obtain personal jurisdiction over corporate officer, personal jurisdiction did not exist by virtue of New York's long-arm statute); *United States Dental Institute v. American Association of Orthodontists*, 396 F.Supp. 565 (N.D.Ill.1975). See also, *Athlete's Foot of Delaware, Inc. v. Ralph Libonati Co., Inc.*, 445 F.Supp. 35, 48 (D.Del. 1977) (although § 4 of the Clayton Act authorizes civil suits against non-corporate defendants, it does not authorize service in a district other than that in which the suit is brought).

■ The New York State long-arm statute provides personal jurisdiction over defendants who commit tortious acts without the state causing injury within the state, if the defendant regularly does or solicits business within the state or expects the act to have consequences within the state and derives substantial revenue from interstate commerce. N.Y. CPLR § 302(a)(3). An action alleging violations of antitrust laws is a claim for injuries sustained, and therefore is in the nature of a tort and long-arm jurisdiction would apply. See, *Fashion Two Twenty, Inc. v. Steinberg*, 339 F.Supp. 836 (E.D.N.Y.1971). While Plaintiff has the burden of establishing personal jurisdiction over Defendants by a preponderance of the evidence, until an evidentiary hearing or trial is held, a prima facie showing of jurisdiction suffices, notwithstanding any controverting presentation by Defendants to defeat the motion. See, *Marine Midland Bank v. Miller*, 664 F.2d 899, 904 (2d Cir.1981).

According to Plaintiff's amended complaint, all of the individual Defendants, except for Dr. Thiede as discussed above, are residents of states other than New York. Plaintiff does not allege that any of these Defendants, except as officers or directors of the Board, had any contacts with the state of New York. Rather, he argues in his memorandum of law in opposition to

Defendants' motion that these individuals conspired to violate the federal antitrust laws, resulting in his injury.

However, even if these allegations were true, New York's long-arm statute would still not apply as no representations have been made that the individual Defendants engage in or solicit business within New York, or derive substantial revenue from New York. See, *Socialist Workers Party v. Attorney General of the United States*, 375 F.Supp. 318, 322 (S.D.N.Y.1974) (in order for a plaintiff to subject an out-of-state defendant to jurisdiction in New York, it is necessary to do more than put forward an unsupported allegation, plaintiff must come forward with some definite evidentiary facts to connect defendants with transactions occurring in New York). Plaintiff has not shown that sufficient minimum contacts exist between the individual Defendants and New York in order to comply with the due process clause of the Fourteenth Amendment which requires that the exercise of jurisdiction over the non-resident be both reasonable and just according to the traditional concepts of fair play and substantial justice. *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Mayes v. Leipziger*, 674 F.2d 178, 183 (2d Cir.1982). Moreover, Plaintiff is unable to point to any New York authority suggesting that the New York courts would think otherwise as to the reach of its long-arm statute.

Therefore, based on the foregoing analysis, I recommend that Plaintiff's amended complaint be dismissed as against Defendants Munger, Clinton, Janiak, Tintinalli, Meislin, Shader, Vance, Bishop, Braen, Davidson, Healy, Hudson, Jones, Knopp, Neerhout, Rund, Stennes, and Whelan without prejudice. This dismissal would not preclude the subsequent addition of such individual Defendants if a jurisdictional basis for doing so can be established. See, *Socialist Workers Party, supra*, at 326.

## II. *Antitrust Claims*

Plaintiff is alleging causes of action under both § 1 and § 2 of the Sherman Act.

Specifically, Plaintiff is claiming that the Board arbitrarily closed the "practice track" mode of eligibility to take the certification examination, precluding him and others similarly situated from becoming Diplomates of the Board and competing with other Diplomates in the emergency medicine market. Plaintiff asserts that the Board has a monopoly over the market for emergency medicine Diplomates, and that the exclusion of other qualified emergency medicine physicians from such market is an unreasonable restraint on trade. The effect of the exclusion will allegedly be to suppress competition with Diplomates of the Board. In addition, Plaintiff alleges that the resulting smaller supply of emergency medicine Diplomates will inflate the price for emergency medical services in the relevant market.

Defendants argue that the closure of the "practice track" mode was not arbitrary, rather, it had been publicized in emergency medicine journals since at least 1978. Defendants assert that the market for emergency medicine physicians consists of many physicians, both Board-certified and non-Board-certified, and that the Board does not possess a monopoly in the market for emergency medicine physicians. In addition, Defendants claim that, while the Board certifies emergency medicine physicians as highly qualified, it does not coerce anyone employing non-Board-certified physicians into using only emergency medicine Diplomates, and neither does it play any part in regulating the criteria used by hospitals, medical staffs, and other emergency medicine service providers in employing emergency medicine physicians, Board-certified or not. Therefore, Defendants contend that Plaintiff cannot show any violation of federal antitrust laws as Defendants have not conspired to restrain trade and do not possess a market monopoly in the field of emergency medicine.

Defendants rely at some length on several decisions dealing with antitrust claims in the health services and products market. These cases are, in the court's view, either distinguishable because they were decided upon a summary judgment motion following substantive fact discovery, or their

analysis is severely undercut by the recent decision of the Supreme Court in *Summit Health v. Pinhas,* — U.S. ——, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991). In at least one such case, *Machovec v. Council for the National Register of Health Service Providers in Psychology, Inc.,* 616 F.Supp. 258 (D.C.Va.1985), the court implicitly approved a definition of a relevant market less well articulated than Plaintiff's here in order to reach the merits of the plaintiff's Sherman Act claims in that case. See, *Machovec, supra,* at 270. Also, in *Machovec,* the court expressly observed that an antitrust defendant's conduct of "cutting off access" to the health care services market would be a proper allegation of antitrust injury. *Machovec, supra,* at 270–271. The potential for unreasonably restricting the market for Board-certified emergency medicine physicians and the allegations of anti-competitive restrictions on the availability of Board-certified emergency treatment providers is what this case is fundamentally about.

Below is a discussion of Defendants' arguments as to why Plaintiff's claims should be dismissed.

1. *Failure to allege a substantial and adverse impact on interstate commerce.*

■ The Sherman Act prohibits every contract, combination, or conspiracy "in restraint of trade or commerce among the several States," 15 U.S.C. § 1, and also prohibits monopolizing "any part of the trade or commerce among the several States." 15 U.S.C. § 2.

■ In order to prove a violation of Section 1 of the Sherman Act, a plaintiff must establish the existence of a contract, combination or conspiracy which constitutes a restraint of trade and has an impact on interstate commerce. See, *Standard Oil of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Defendants argue that Plaintiff has not alleged any facts that would permit an inference that Defendants' actions have any effect on interstate commerce.

■ To establish the required element of an impact on interstate commerce, a federal anti-trust plaintiff need only show that defendant's general business conduct be either *in* or substantially *affect* interstate commerce. See, *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 241–242, 100 S.Ct. 502, 508–09, 62 L.Ed.2d 441 (1980). Further, in the case of a claim under § 1 of the Sherman Act, a plaintiff is not required to "allege, or prove, an actual effect·[of the alleged restraint] on interstate commerce to support federal jurisdiction." *Summit Health, supra,* — U.S. at ——, 111 S.Ct. at 1848. See also, P. Areeda & H. Hovenkamp, Antitrust Law ¶ 231.1c (Supp.1990) ("although plaintiff need not make a 'particularized showing' of an actual interstate effect caused by the challenged conduct, he must show that it would inherently tend, as a matter of practical economics, to have an interstate effect").

Plaintiff has clearly alleged that the Defendant Board is an organization with national purposes and activities using interstate facilities to accomplish its professional certification mission. See, Amended Complaint, ¶ 39–40. Defendant is, therefore, by definition, operating in interstate commerce and subject to federal antitrust jurisdiction. See, *Marrese v. American Academy of Orthopaedic Surgeons,* 1991 WL 5827 (N.D.Ill.1991) (court noted that the fact that the case affected interstate commerce was "not in dispute because the Academy ha[d] members nationwide").

Plaintiff has further alleged that Defendants' Diplomate certification qualifications constitute an unreasonable restraint on trade because, if permitted, it will have the effect of lessening the availability of Board-certified emergency medicine physicians. That the alleged restraint may immediately affect only Plaintiff's ability to compete does not suggest a lack of "nexus between the restraint on [Plaintiff's] practice and interstate commerce." *Summit Health, supra,* — U.S. at ——, 111 S.Ct. at 1847.

In *Summit Health, supra,* a hospital began peer review proceedings against a

Los Angeles ophthalmologist and subsequently terminated his hospital privileges after he refused to sign a "sham" contract providing for payments for services he would not have been asked to perform. The hospital had asked Dr. Pinhas to sign such a contract following Medicare's disallowance of reimbursement of surgeon assistants' fees. The Court reiterated that civil liability under the Sherman Act "may be established by proof of *either* an unlawful purpose or an anticompetitive effect," stating .that "proper analysis focuses, not upon actual consequences, but rather upon the potential harm that would ensue if the conspiracy was successful." *Summit Health, supra,* —— U.S. at ——, 111 S.Ct. at 1847, (quoting, *McLain, supra,* at 243, 100 S.Ct. at 509). The Court determined that if the conspiracy alleged in Dr. Pinhas' complaint was successful, a reduction in the provision of ophthalmological services in the Los Angeles area would affect interstate commerce and, therefore, the Sherman Act's jurisdictional requirement was met.

In the instant case, Plaintiff alleges that, if Defendants' conspiracy is successful, there will only be a small number of Board-certified emergency medicine specialists as only physicians having obtained one of the limited number of positions in an emergency medicine residency program and having successfully completed such residency would be qualified to become Board-certified and that, therefore, the practice of emergency medicine will be controlled by this allegedly small number of physicians, resulting in an anti-competitive effect on the market. Specifically, Plaintiff argues that New York State, beginning in 1993, will require all emergency room physicians to be Board-certified[1], and, if Plaintiff is not permitted to take (and presumably pass) the certification examination, he will be removed from the New York State market for emergency medicine physicians where Plaintiff currently practices. See, Amended Complaint, ¶ 81. While the Defendants concede that New York State will require all emergency room physicians practicing within the state to be Board-certified, Defendants note that the certifications may be in either emergency medicine, internal medicine, surgery, or family practice.[2] However, based on the pleadings, it is not known, at this stage of the litigation, whether Plaintiff may even qualify under any of these alternatives. Further, Defendants state that New York's regulations are not established or promulgated by the Board and, therefore, provide no support for an antitrust claim against Defendants.

The Supreme Court, however, has held that in antitrust cases, where the proof is largely in the possession of defendants, dismissals of actions prior to giving a plaintiff ample opportunity for discovery "should be granted very sparingly." *Hospital Building Co. v. Trustees of the Rex Hospital,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976). See also, *McLain, supra,* at 246, 100 S.Ct. at 511 (the high standard required for a dismissal of a complaint applies with no less force to a Sherman Act claim, "where one of the requisites of a cause of action is the existence of a demonstrable nexus between the defendants' activity and interstate commerce). Here, the Defendant Board is a national organization with members nationwide, using interstate means to operate and pursue its objective of certifying emergency medicine physicians. Its certification requirements are alleged to restrain a national market for Board-certified emergency care physicians with its implicit tendency to affect access to and the price of the services of such certified physicians. It will require little evidence to support the

---

1. Effective July 1, 1993, the New York State Department of Health will require all emergency service attending physicians to be duly licensed, currently registered, and Board-certified or Board-admissible (eligible to take the examination) in either emergency medicine, family practice, surgery, or internal medicine. See, 10 N.Y.C.R.R. § 405.19.

2. Other medical specialties also have associations of physicians which certify physicians in particular specialties in much the same way as the Board certifies physicians in emergency medicine, e.g., the American Board of Internal Medicine and the American Board of Ophthalmology.

observation that users of health care facilities nationwide, including interstate travelers, require emergency care services. Accordingly, it is not unreasonable to conclude, for pleading purposes, that the restraints alleged by Plaintiff will, "as a matter of practical economics," impact upon interstate commerce.

■ Plaintiff does not, contrary to Defendants' argument, (see, Defendants' Reply Memorandum, dated August 28, 1991, at page 7), need to prove that there are scores of other emergency medicine physicians who are similarly situated. Antitrust laws are intended to protect even one competitor's right to enter and compete in a relevant market. See, e.g., *Los Angeles Memorial Coliseum Commission v. National Football League,* 726 F.2d 1381 (9th Cir.1984), *cert. denied,* 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984) (interference with relocation of one football team to market where another football team was located was held to be in violation of antitrust laws); *Practice Perfect, Inc. v. Hamilton County Pharmaceutical Association,* 732 F.Supp. 798, 802 (S.D.Ohio 1989) (court noted that a serious potential competitor is protected by antitrust laws). Plaintiff alleges that he competes in the New York and United States markets for the services of Board-certified physicians and for the services of emergency physicians in general. See, Amended Complaint, ¶ 53. The majority in *Summit Health* had no difficulty in concluding that, as in this case, the exclusion of the skilled medical services of even one physician from a large metropolitan health care market was potentially actionable. Therefore, there is ample authority to suggest that Plaintiff's Section 1 claim may have merit.

■ Plaintiff is entitled to test whether Defendants' abolishment of the "practice track" mode represents an unreasonable restraint of trade. Such facially rational appearing criteria have been held unreasonable in other contexts. See, *Wilk v. American Medical Association,* 719 F.2d 207 (7th Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2398, 2399, 81 L.Ed.2d 355 (1984) (where chiropractors sued medical association for damages resulting from association's refusal to deal with chiropractors, the court, in reversing a trial verdict in favor of defendants, noted that it could find that members of an association promulgated guidelines sanctioning conduct in violation of § 1 of the Sherman Act). See also, *Welch v. American Psychoanalytic Association,* 1986 WL 4537 (S.D.N.Y.1986) (where plaintiffs asserted that standards for training adopted by defendants unreasonably restrained trade in violation of the antitrust laws, court denied defendant's motion for dismissal, holding that it was unable to ascertain, without discovery, whether defendant's admission and referral policies were "at least in part motivated by commercial interest"). Denial of access to professional association memberships which confer economic advantage for members represents a prohibited restraint of trade for Sherman Act purposes unless found to be reasonable. See, *Kreuzer v. American Academy of Periodontology,* 735 F.2d 1479, 1490 (D.C.Cir.1984). After discovery and trial, a jury conceivably may conclude that Defendants' prerequisites for Diplomate status are anti-competitive and in violation of the Sherman Act.

Defendants rely on *Furlong v. Long Island College Hospital,* 710 F.2d 922 (2d Cir.1983), which held that a plaintiff's complaint must be dismissed because the court could not "permit conclusory statements to substitute for minimally sufficient factual allegations." *Furlong* can be distinguished from the instant case as Plaintiff, in this case, has pleaded specific facts to provide a jurisdictional basis, sufficient under *McLain, supra,* and *Summit Health, supra,* to support a Sherman Act claim.

In this case, there is no question that Defendants certify emergency medicine physicians throughout the United States and, in so doing, are engaged in and affect interstate commerce. Any limitation on the number of Board-certified emergency room physicians conceivably resulting from the Board's present certification practices would certainly have an impact on hospital services throughout the country, including the Western New York region. Therefore,

924

for the purposes of Defendants' motion to dismiss, Plaintiff has established a sufficient nexus between the alleged trade restraint and interstate commerce, and has thereby shown an adequate jurisdictional basis for his Sherman Act claims to proceed.

2. *Failure to state a conspiracy within the meaning of § 1 of the Sherman Act.*

 Defendants argue that Plaintiff has failed to allege any conspiracy within the meaning of § 1 of the Sherman Act. Specifically, Defendants argue that since a conspiracy requires, by definition, a concerted action by two or more persons, the Board cannot conspire with itself to exclude Plaintiff from the relevant market. Defendants rely upon *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), for this proposition.

In *Copperweld,* the respondent brought an antitrust action against petitioners—a competing corporation, which manufactured steel tubing, and its wholly owned subsidiary. The Court held that § 1 of the Sherman Act was limited to concerted conduct and that it did not prohibit conduct that was wholly unilateral. As the activities of a parent and a subsidiary company were viewed as that of a single enterprise for purposes of § 1, the Court held that petitioners were incapable of conspiring with each other for purposes of the Sherman Act.

Defendants, in this case, contend that, as in *Copperweld,* the Board cannot conspire with itself against Plaintiff.

*Copperweld,* however, is distinguishable from the instant case. The Board, while maintaining the status of a not-for-profit corporation, is analogous to a professional association as the Board consists of physicians throughout the nation who have taken the certification examination in emergency medicine and have become Board-certified. According to Plaintiff's amended complaint, the members of the Board have conspired among themselves to limit the number of Board-certified emergency medi-

cine physicians and to thus restrain future competition in the field of emergency medicine as a result of the conspiracy. See, Amended Complaint, ¶ 48.

In *Federal Trade Commission v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), decided after *Copperweld,* the Court held that the members of the Federation had conspired among themselves and formulated a horizontal agreement among its members to withhold a particular service from the market. Specifically, the Court ruled that the dentists' refusal, as a group, to submit x-rays to insurers violated § 1 of the Sherman Act. In *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), the Court observed that, "private standard-setting associations ... include members having horizontal and vertical business relations," and that there is "no doubt that members of such associations often have economic incentives to restrain competition."

In *Marrese v. American Academy of Orthopaedic Surgeons,* 496 F.Supp. 236 (1980), *rev'd on other grounds,* 726 F.2d 1150 (7th Cir.1984), *rev'd on other grounds,* 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985), the court concluded that cases involving ordinary business corporations which hold that antitrust claims cannot be based on a conspiracy between such corporations and its own officers are distinguishable from situations involving entities which are separate from its constituent members. The court stated that, "where the necessary anticompetitive allegations are present, the fact that an association of competitors is involved and enforces its activities by by-laws or similar internal means is itself sufficient to ground an antitrust complaint." *Marrese, supra,* at 241. See also, *Volvo North America Corp. v. Men's International Professional Tennis Council,* 857 F.2d 55 (2d Cir.1988) (group comprised of tennis professionals and tournament owners held to be an association consisting of multiple entities capable of violating § 1 of the Sherman Act).

In this case, Plaintiff has alleged that the Board's decision to terminate the "practice track" mode qualification is a conspiracy to limit the competition in the field of emergency medicine, an anticompetitive practice. Antitrust claims have been sustained against associations of competitors alleged to have engaged in exclusionary or other anticompetitive practices. *Allied Tube & Conduit Corp., supra.; American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (standard setting organization like American Society of Mechanical Engineers can be rife with opportunities for anticompetitive activity); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) (Sherman Act violated by publication of minimum fee schedule by a county bar association and its enforcement by the State Bar); *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) (antitrust laws appropriate as a check upon anticompetitive acts of stock exchanges which conflict with their duty to keep their operations and those of their members honest and viable).

In addition, while Defendants argue that the Section 1 antitrust claim is based upon an alleged conspiracy between Defendants and "various and diverse *unidentified* persons" (see, Defendants' Memorandum in Support of the Motion to Dismiss the Complaint, dated April 5, 1991, at page 22), and therefore, subject to dismissal, (see, *Telsat v. Entertainment and Sports Programming Network*, 753 F.Supp. 109, 115 (S.D.N.Y.1990) (co-conspirators must be identified in the complaint when asserting a § 1 antitrust claim)), Plaintiff clearly alleges a conspiracy between members of the Board and other non-party members of the Board, namely other Board-certified Diplomates, to restrain competition in the field of emergency medicine. See, Amended Complaint, ¶ 39.

Therefore, as an antitrust claim can be asserted against the Board for an alleged conspiracy among its members, Plaintiff's Sherman Act claim should be allowed to proceed at this stage of the litigation.

## 3. *Failure to identify a relevant product and geographic market renders the antitrust claims facially insufficient.*

In order to withstand a motion to dismiss, an antitrust claimant must identify the relevant market and allege in the complaint how the net economic effect of the alleged violation is to restrain trade in the relevant market. See, *International Television Productions, Ltd. v. Twentieth Century Fox*, 622 F.Supp. 1532, 1539 (S.D.N.Y.1985). As to Count One of the Amended Complaint, Plaintiff's market definition defines the relevant market as the United States market for the services of emergency medicine physicians (see, Amended Complaint, ¶.87) and, as to Count Two of the Amended Complaint, Plaintiff's market definition defines the relevant market as the market for the services of Diplomates of the Board (see, Amended Complaint ¶ 94). Defendants argue that Plaintiff's market definitions do not define relevant product or geographic markets for purposes of an antitrust claim, and, in addition, Plaintiff is pleading inconsistent facts in his complaint and, therefore, Plaintiff's antitrust claims must be dismissed. See, *CEO Marketing Promotions Company v. Heartland Promotions, Inc.*, 739 F.Supp. 1150, 1152–53 (N.D.Ill.1990).

A short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust actions. See, *Nagler v. Admiral Corp.*, 248 F.2d 319 (2d Cir.1957). A pleading may present alternative statements of the facts. See, *Barr v. Dramatists Guild, Inc.*, 573 F.Supp. 555 (S.D.N.Y.1983). As Fed.R.Civ.P. 8(e) authorizes hypothetical, alternative, and inconsistent pleadings, the pleading of inconsistent facts does not subvert adequate pleading. See, *Adler v. American Standard Corp.*, 538 F.Supp. 572 (D.Md.1982). Therefore, Plaintiff's use of factually inconsistent market definitions (assuming for the sake of this discussion that they are inconsistent) does not render his complaint inadequate.

The notice pleading system requires only that the allegations in the com-

plaint give notice as to what markets are being brought into issue. See, *Ag Fur Industrielle Elektronik Agie v. Sodick Company, Ltd.*, 748 F.Supp. 1305, 1316 (N.D.Ill.1990). See also, *SCM Corporation v. Radio Corporation of America*, 407 F.2d 166 (2d Cir.1969) (conclusory allegations in antitrust action must be examined in light of notice pleading). Whether or not the alleged market in the complaint is in fact the relevant one is a matter for proof, not pleading. *Ag Fur Industrielle Elektronik Agie, supra,* at 1317. The determination of the relevant market is a threshold requirement in determining the merits of an antitrust claim. *Disenos Artisticos E Industriales, S.A. v. Work*, 676 F.Supp. 1254 (E.D.N.Y.1987). However, the definition of the relevant market is a question of fact to be determined in the context of each case. See, *Borough of Lansdale v. Philadelphia Electric Co.*, 692 F.2d 307, 311 (3d Cir.1982). An antitrust complaint may be dismissed where the market alleged is too vague and too broad to explain what market the plaintiff is alleging to have been monopolized. See, *International Television Productions, Ltd., supra,* at 1539.

In this case, Plaintiffs have alleged two relevant markets, i.e., the market for all emergency medicine physicians in the United States and the market for emergency medicine Diplomates in the United States. These definitions are not vague or overly broad, but do provide Defendants with notice as to which markets they are alleged to be restraining competition in. The court notes that although a single product or service cannot constitute a relevant market unless there are no reasonably interchangeable products or services in competition with it, (see, *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)), Plaintiff may well be able to show that non-Board-certified emergency physicians do not enjoy an equivalent degree of consumer preference as Diplomates.

Despite Plaintiff pleading two differing markets in each of his counts, for purposes of withstanding a motion to dismiss, the market definitions are adequate to allow Plaintiff to proceed. Whether evidence can establish the existence of the two service markets posited by Plaintiff is a question for another day.

 As to Defendants' argument that the practice of medicine is a local service industry, *Summit Health, Ltd., supra,* —— U.S. at ——, 111 S.Ct. at 1848, instructs that "the competitive significance of [a plaintiff's] exclusion from the market must be measured, not just by a particularized evaluation of his own practice, but rather, by a general evaluation of the impact of the restraint on other participants and potential participants in the market from which he has been excluded." Despite Plaintiff's own employment in a local market, the claims contained in his amended complaint allege a nationwide restraint on the services of emergency medicine physicians, particularly a restraint on the addition of emergency medicine physicians to the market of Board-certified emergency medicine physicians. Plaintiff has alleged in the amended complaint that the Board has conspired with its members to deny Plaintiff and other emergency medicine physicians similarly situated the opportunity to take the certification examination for the purpose of restraining competition with Board Diplomates within the United States market for services of emergency medicine physicians and that such reduced competition will sustain artificially high and inflated prices for emergency medicine services. See, Amended Complaint, at ¶ 44–45. Plaintiff has also alleged that the Board furnishes lists of Diplomates to other physicians, hospitals, medical schools, and the public in order to induce such parties to employ Board-certified physicians as opposed to non-Diplomates, based on the Board's alleged representation that Diplomates are the most highly qualified to practice emergency medicine. See, Amended Complaint, at ¶ 79–80. Such allegations are sufficient to show a restraint of trade in the asserted relevant markets. See, *Summit Health, Ltd., supra,* —— U.S. at ——, 111 S.Ct. at 1848.

4. *Failure to state that Defendants have achieved a monopoly in any relevant market.*

 Two elements must be proved in order to be successful on a claim alleging the offense of monopolization under § 2 of the Sherman Act: (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. See, *Volvo North America Corp. v. Men's International Professional Tennis Council*, 857 F.2d 55, 73 (2d Cir.1988); *Telsat v. Entertainment and Sports Programming Network*, 753 F.Supp. 109, 112 (S.D.N.Y.1990).

Defendants argue that Plaintiff has failed to allege the first element of a monopolization claim, i.e., the possession of monopoly power in the relevant market. Plaintiff claims that Defendants, by definition, comprise the entire market of Board-certified emergency medicine physicians, thus there is no question but that Defendants monopolize such market and are attempting to exclude other emergency physicians from qualifying to enter the market. In addition, Plaintiff's amended complaint alleges that Defendants have willfully maintained their monopoly power by strictly limiting the number of physicians who Defendants will qualify to sit for the certification examination, a successful completion of which is required before such physicians can enter the market of Board-certified emergency medicine physicians.

 The offense of attempted monopolization under § 2 of the Sherman Act requires proof of three elements: (1) anticompetitive or exclusionary conduct; (2) specific intent to monopolize; and (3) a dangerous probability that the attempt will succeed. *Volvo North America Corp., supra*, at 73-74. Proof of the first element of an attempted monopolization claim may be used to infer the second element. *Volvo North America Corp., supra*, at 74. Evidence of anticompetitive conduct, together with proof of monopoly power, may demonstrate a dangerous probability that the attempt will succeed. *Volvo North America Corp., supra*, at 74.

Plaintiff has specifically alleged anticompetitive and exclusionary conduct on the part of Defendants. See, Amended Complaint, ¶ 55–¶ 74. Such allegations, while not proven, must be accepted as true for the purposes of a motion to dismiss. See, *Hill v. Sullivan*, 125 F.R.D. 86, 90 (S.D.N.Y.1989) ("all allegations in plaintiffs' amended complaint must be accepted as true and liberally construed"). These allegations may be used to infer that Defendants had a specific intent to monopolize the market. See, *Volvo North America Corp., supra*. As stated above, Defendants allegedly possess monopoly power in the market for Board-certified emergency medicine physicians, and this *prima facie* showing of monopoly power may be used to infer that there is a dangerous probability that Defendants' alleged attempt to monopolize the market will succeed. See, *Volvo North America Corp., supra*, at 74.

Accepting, for purposes of this motion, all Plaintiff's allegations as true, Defendants' motion to dismiss Plaintiff's monopolization claim should be denied.

III. *New York State Human Rights Claim*
*Failure to state a claim of discrimination under New York State's Human Rights Law.*

 Plaintiff, a native of Trinidad and a black male, asserts in his complaint that the Board required him to attach a photograph of himself to his application to take the certification examination, and that such requirement allowed the Board to consider Plaintiff's race while reviewing his application, in violation of New York's Human Rights Law, New York Executive Law § 290 *et seq.* Defendants argue that this claim should be dismissed as the Board is not subject to the Human Rights Law because it is a private organization, a statutory exception to the law, and even if it was subject to the law, Plaintiff did not allege in his complaint that the Board took Plaintiff's race into account when reviewing his application. In addition, Defendants argue

that Plaintiff cannot claim that the Board rejected his application pursuant to the Board's guidelines for qualification to take the exam at the same time that Plaintiff argues that the Board did not approve his application solely because of his race.

It is well settled that a party may plead inconsistent theories of relief in a complaint. See, Fed.R.Civ.P. 8; *Greater Buffalo Press, Inc. v. Harris Corporation,* 1988 WL 85943 (W.D.N.Y.1988) (any inconsistency between alternative claims does not render the pleading defective); *Barr, supra,* at 560 (Fed.R.Civ.P. 8(e)(2) allows a party to state as many separate claims as he has, regardless of consistency). Therefore, Defendants' argument that Plaintiff's discrimination claim is inconsistent with his antitrust claims is invalid.

New York's Human Rights Law was enacted by its legislature to ensure that all individuals within the state are afforded an equal opportunity to enjoy a full and productive life, free from discrimination. N.Y.Executive Law § 290(2). It is unlawful for an employer or licensing agency to discriminate against a person on account of his race. N.Y.Executive Law § 296(1)(a). It is also an unlawful discriminatory practice for any person, such as an owner, agent, or employee, of any place of public accommodation to refuse or deny to an individual any of the privileges or uses of such public accommodation. N.Y.Executive Law § 296(2)(a). Plaintiff has not suggested that the Board is an employer or a licensing agency. See, *e.g., George v. New Jersey Board of Veterinary Medical Examiners,* 635 F.Supp. 953 (D.N.J.1985), *aff'd,* 794 F.2d 113 (3d Cir.1986) (Board held not to be an "employer" or "employment agency" within meaning of Title VII and thus was not subject to liability to applicants asserting claims of discrimination under the Act).

Defendants argue that the Board is an organization "which is in its nature distinctly private", (see N.Y.Executive Law § 292(9)), and therefore, it is not subject to the New York Human Rights Law. Under the New York statute, Defendants have the burden to show it is within the exception. *United States Power Squadrons v. State Human Rights Appeal Board,* 59 N.Y.2d 401, 465 N.Y.S.2d 871, 876, 452 N.E.2d 1199, 1204 (N.Y.1983).

Whether a place of public accommodation is a "distinctly private" club and therefore excluded from the operation of the Human Rights Law is a question of fact. See, *United States Power Squadrons, supra.* In determining whether the exception applies, the fact finder may consider whether the organization (1) has permanent machinery established to carefully screen applicants on any basis or no basis at all, i.e., membership is determined by subjective, not objective factors, (2) limits the use of the facilities and services of the organization to members and *bona fide* guests of members, (3) is controlled by the membership, (4) is nonprofit and operated solely for the benefit and pleasure of the members, and (5) directs its publicity exclusively and only to members for their information and guidance. See, *United States Power Squadrons, supra.*

It may prove to be the case that the Board's corporate purposes and activities are intended to directly affect the general public by improving the level of care and treatment provided by emergency medicine physicians to members of the public in need of such often vital services. If that or other public purposes directly relating to the Board's existence and activity can be established, then the Board may well be considered to be a place of public accommodation as defined by the statute. As the court in *United States Power Squadrons* observed, "[a] purely private club does more to make certain that desirables are admitted than simply exclude persons believed to be undesirable and its activities are conducted principally for its members, not the public." *United States Power Squadrons, supra,* 465 N.Y.S.2d at 877, 452 N.E.2d at 1205.

Plaintiff has given fair notice of his discrimination claim in his amended complaint. Assuming for purposes of discussion that Defendant is a place of public accommodation and covered by the statute, the requirement that a photograph be attached to

the application prior to being adjudged qualified to sit for the Board's examination, as opposed to requiring the submission of a photograph for identification purposes in anticipation of sitting for the exam following preliminary qualification, raises a suspicion that the requirement may serve a discriminatory purpose.

As a threshold matter, it is an issue of fact as to whether the Board is subject to the New York Human Rights Law. If the Board is subject to the Human Rights Law and if the request for a photograph of Plaintiff to be attached to his application is found to be a discriminatory practice, then the Board may be liable for discrimination under the New York Human Rights Law, notwithstanding the fact that the Board is a Michigan not-for-profit corporation. See, N.Y.Executive Law § 298–a(1) (the provisions of the Human Rights Law apply to an act committed outside New York against a resident of New York if such act would constitute an unlawful discriminatory practice if committed within New York).

Following discovery on the issue of the applicability of the Human Rights Law to the Board, the court can determine whether the Board is indeed subject to New York's Human Rights Law, N.Y.Executive Law § 290 et seq. The court notes that, in order for Plaintiff to succeed on this cause of action, he must also succeed on his antitrust claims, as Plaintiff must show that, but for the Board's discriminatory practice, he would have been successful in his application to take the certification examination. See, *Brown v. Albert Einstein College of Medicine of Yeshiva University*, 172 A.D.2d 197, 568 N.Y.S.2d 61 (App.Div. 1st Dep't.1991) (plaintiff was not "otherwise qualified" for admission to medical school, and thus, failure to admit plaintiff into medical school did not constitute age discrimination in violation of New York's Human Rights Law). At this stage of the litigation, however, it is premature to dismiss this cause of action.

## CONCLUSION

Based on the foregoing discussion, I recommend that Defendants' motion to dis-

miss for lack of personal jurisdiction against Defendants Munger, Clinton, Janiak, Tintinalli, Meislin, Shader, Vance, Bishop, Braen, Davidson, Healy, Hudson, Jones, Knopp, Neerhout, Rund, Stennes, and Whelan be GRANTED, without prejudice. Defendants' motion to dismiss Defendant Thiede from the action for lack of personal jurisdiction should be DENIED as Dr. Thiede is a New York resident. Defendants' motions to dismiss all Plaintiff's causes of action for lack of subject matter jurisdiction and for failure to state a claim for which relief can be granted should be DENIED.

Pursuant to 28 U.S.C. 636(b)(1), it is hereby

ORDERED that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 30(a).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the counsel for Plaintiff and Defendants.

Following Judge Arcara's decision on this motion, counsel is directed to contact the office of the undersigned to schedule any further proceedings in this matter.

SO ORDERED.