## MONTGOMERY COUNTY ASSOCIATION OF REALTORS, INC., et al.

v.

## REALTY PHOTO MASTER CORPORATION, et al.

Civ. No. L–90–2141.

United States District Court, D. Maryland.

Feb. 10, 1995.

---

James A. Rothschild and Gregory L. Van Geison, Baltimore, MD, for plaintiff and counter-defendant Montgomery County Ass'n of Realtors, Inc.

David Huntington Williams, Bethesda, MD, for defendant and counter-claimant Realty Photo Master Corp. and defendant Hermreck.

Thomas C. Lederman, and Tydings & Rosenberg, Baltimore, MD, and Michael Blackstone, and King and Nordlinger, Washington, DC, for counter-defendant Shannon and Luchs Co.

## MEMORANDUM

LEGG, District Judge.

The Court now considers eight (8) motions for summary judgment. The Montgomery County Association of Realtors, Inc. ("MCAR"), a plaintiff herein, filed six of these motions.[1] Shannon & Luchs Co. ("Shannon"—now known as "REBLC Inc."), a counterclaim-defendant herein, and Realty Photo Master Corporation ("RPM"), a defendant herein, each filed one motion for summary judgment.[2] Because the motions have been fully briefed, the Court dispenses with a hearing. *See* D.Md.R. 105(6). For the reasons stated below, the Court shall, by separate Order:

DENY MCAR's motion for summary judgment to enjoin copyright infringement;

DENY MCAR's motion for summary judgment to enjoin unfair competition;

DENY MCAR's motion for summary judgment to enjoin unauthorized interception, disclosure and use of the MLS database compilation communications;

DENY MCAR's motion for summary judgment to enjoin misappropriation of trade secrets;

DENY MCAR's motion to strike portions of defendants' reply brief which improperly raises new issues;

GRANT MCAR's motion for summary judgment on Counts I, II, and III of the counterclaim (the federal and Maryland antitrust claims);

GRANT MCAR's motion for summary judgment on Counts IV, V, VI, and VII of the counterclaim (the breach of contract, defamation and tortious interference with contractual relations claims);

GRANT Shannon's motion for summary judgment (the federal and Maryland antitrust claims); and

GRANT IN PART AND DENY IN PART RPM's motion for summary judgment.

## I. BACKGROUND

In a Memorandum and Order dated January 24, 1992, the Court denied a motion for a preliminary injunction filed by defendant/counter-plaintiff Realty Photo Master Corporation. Because that decision thoroughly reviewed the facts of this case, *see Montgomery County Ass'n of Realtors, Inc. v. Realty Photo Master Corp.,* 783 F.Supp. 952 (D.Md.1992), *aff'd,* 993 F.2d 1538, 1993–1 Trade Cases ¶ 70,239 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 440, 126 L.Ed.2d 374 (1993) *("MCAR"),* the Court shall dispense with a second factual recitation except as necessary to understand the issues discussed in this Memorandum.

MCAR, a voluntary association of realtors in Montgomery County, Maryland, provides two services that form the core of this dispute. First, MCAR compiles and disseminates to its members a "Multiple Listing Service" ("MLS"), a computerized directory of real estate for sale in and around Montgomery County. MCAR members can access the MLS through their computers by using their access code.

Second, MCAR provides members with its "New Homes Sales" contract forms. MCAR members may also access the forms through their computers.

In 1988, RPM began offering a photographic service to MCAR's members. On a daily basis, RPM used a MCAR customer's access code to gain entry to the MCAR mainframe and identify the new listings. RPM then photographed the properties and fed

---

1. On November 2, 1992, MCAR filed six separate motions totaling 113 pages to circumvent the page limitations on memoranda imposed by Local Rule 105(3).

2. Realty Photo Master Corporation filed its motion on November 2, 1992. Shannon & Luchs, Co. filed its motion on November 3, 1992.

the pictures into its own mainframe computer, which digitized and downloaded the pictures into the personal computers of RPM's customers. RPM provided its customers with software that combined RPM's photographs with MCAR's database. RPM also provided copies of MCAR's real estate contract forms to its customers.

Upon discovering RPM's activities, MCAR sued RPM for copyright infringement, unfair competition, unauthorized wiretapping and misappropriation of trade secrets. RPM has responded by countersuing MCAR and its officers for tortious interference with contractual relations, defamation and breach of contract. RPM also sued MCAR and Shannon, a MCAR member, for conspiring in restraint of trade under the Sherman Act, 15 U.S.C. § 1, and Maryland's antitrust statute, Md.Com.Law Code Ann. § 11–204(a). All of the parties have filed summary judgment motions.[3]

■ The Court may grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This rule "enable[s] a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–889, 110 S.Ct. 3177, 3188–3189, 111 L.Ed.2d 695 (1990). The Court shall view the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Overstreet v. Kentucky Central Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir.1991);

*Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987).

## II. DISCUSSION

### A. MCAR's Motions for Summary Judgment

#### 1. Copyright Infringement

In its motion for summary judgment to enjoin copyright infringement, MCAR alleges infringement of its copyrights for its Multiple Listing Service ("MLS") compilation and New Homes Sales contract forms.[4] RPM counters that there was no impermissible copying of the MLS data and that the MLS compilation in itself cannot receive copyright protection. Further, because RPM did not materially impair the marketability of the MLS data, RPM argues, its accessing of the MLS constitutes "fair use." Finally, RPM asserts that MCAR's denial of access is "an unlawful group boycott" that this Court should not sanction.[5]

■ To prove copyright infringement, MCAR must show (1) that it owned a valid copyright and (2) that the defendant copied original elements of its copyrighted work. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 1295–1296, 113 L.Ed.2d 358 (1991); *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 660 (4th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 443, 126 L.Ed.2d 377 (1993). The Court now examines these requirements and the evidence proffered by the parties.

#### a. Validity of the Copyrights

■ A certificate of copyright registration constitutes prima facie evidence of the validity of the certificate and the facts stated in the certificate. *M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 434 (4th Cir.1986). If a plaintiff possesses a copyright registration certificate, "the only evidence required of the

---

3. In this case, the parties have used a "kitchen sink" approach by including in their briefs every conceivable legal theory. As the following discussion will show, this approach unnecessarily increased the complexity of this case.

4. In its opposition to MCAR's summary judgment motion, RPM does not address whether MCAR's contract forms receive copyright protection. The

Court finds that they do for the same reasons the MLS database does.

5. Def. Consolidated Opposition to MCAR's Motions for Summary Judgment at 5. The Court shall discuss RPM's claim of an "unlawful group boycott" in Section C(2), *infra*.

plaintiff to establish prima facie ownership ... is evidence of plaintiff's chain of title from the original copyright registrant." 3 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 13.01[A] (1993) [hereinafter Nimmer].[6] Once the plaintiff has established a prima facie case, the burden then shifts to the defendant to counter this evidence. *Id.*

MCAR has submitted photocopies of group copyright registrations for its MLS automated database and its contract forms.[7] In disputing the validity of the copyrights, defendants bear "the burden of overcoming the presumption arising out of the granting of the copyright by the Copyright Office." *M. Kramer,* 783 F.2d at 434.

■ RPM cites *Feist, supra,* to carry this burden. In *Feist,* the Supreme Court concluded that the mere alphabetical listing of names, towns, and telephone numbers in a telephone directory does not warrant copyright protection because such a listing did not "possess more than a *de minimis* quantum of creativity." *Id.*

*Feist* does not help RPM's argument. RPM argues that MCAR's MLS database, like the telephone book in *Feist,* is merely a collection of simple facts entitled to no copyright protection. Unlike a telephone directory, however, the arrangement of the information in MCAR's MLS database, "possesses at least some minimal degree of creativity." *Id.* at 345, 111 S.Ct. at 1287. Specifically, many MCAR reports contain marketing puffery that cannot be characterized as factual (*e.g.,* "elegant updated home, close to DC line, gorgeous private back yard, lovely sunroom off LR"). Also, MCAR has employed a unique and elaborate system of abbreviations in organizing its database. That each MLS property report contains some purely factual information relating to the home (*e.g.,* address, style, age, floor plan, asking price)

does not negate the original presentation and arrangement of the information in the database. Thus, MCAR's MLS database is copyrightable and the copyright is valid.

b. *Copying of MCAR's MLS Database*

■ As to the "unauthorized copying" requirement for a copyright infringement claim, "copyright protection may extend only to those components of a work that are original to the author." *Feist,* 499 U.S. at 348, 111 S.Ct. at 1289 (citation omitted). "Thus, if the compilation author clothes facts with an original collocation of words, he or she may be able to claim a copyright in this written expression." *Ibid.* As a result, "[o]thers may copy the underlying facts from the publication, but not the precise words used to present them." *Ibid.*

Even if MCAR's MLS database is copyrightable, RPM contends that MCAR's regulations authorized RPM's downloading of the database. Thus, RPM argues that it could not have infringed upon MCAR's copyrights.

MCAR's regulations contain two provisions for the release of MLS information. The first provision states that all multiple listing information "may be distributed by a Participant to his Licensee(s) if the required fee has been paid to the Service by the Participant on behalf of such Licensee(s)."[8] Even if RPM qualified as a "licensee," (it does not),[9] the record discloses no evidence that either RPM or an affiliated MCAR member broker has ever paid the required user fee for RPM as a licensee. Thus, this provision fails to authorize RPM's access to the MLS.

The second provision, however, states that the MLS "information may be disclosed to bona fide purchasers or other persons essential to the conduct of the Participant's business."[10] This provision does not require the payment of a fee. Consequently, if RPM falls under this provision, it would qualify as an authorized user of the MLS database.

---

**6.** In this case, MCAR is the "author" of the MLS database and therefore need not show chain of custody.

**7.** MCAR Exh. 1–1E.

**8.** MCAR Exh. 29 at D/IX–5 § 9.

**9.** A licensee, according to MCAR's regulations, is "[a]n individual holding a license issued by the Maryland Real Estate Commission and associated with a Participant." MCAR Exh. 29 at D/IX–1 § 2. RPM has proffered no evidence that it holds the required license.

**10.** MCAR Exh. 29 at D/IX–5 § 9.

■ The standard contract between RPM and its customer provides that RPM "is engaged in an ancillary business which is necessary in the conduct of their real estate activities."[11] Under this contract, a reasonable jury could conclude that RPM was a "person essential" to the realtor's business, so as to allow a realtor to grant RPM access to the database without paying the required fee. On the other hand, after hearing all the evidence, a reasonable jury could discount the language of RPM's contract and arrive at the opposite conclusion. Accordingly, the Court shall deny summary judgment on the issue of unauthorized copying and leave to a jury the question of whether RPM's access to the MLS was authorized.[12]

### 2. *MCAR's Unfair Competition Claim*

#### a. *Use of MCAR's Marks*

■ MCAR also asserts that RPM is engaged in unfair competition under the Lanham Act, 15 U.S.C. §§ 1053 *et seq.* Specifically, MCAR asserts a trademark interest in the marks "the Association," "the Board," "MCBR" and "MCAR"[13] that RPM violated by using MCAR's alleged trademarks in a way that is likely to confuse the public.

In the Court's view, MCAR cannot sustain its unfair competition claim if RPM's use of the MLS was authorized under MCAR's regulations. During the time covered by the complaint, RPM did not sell its services independently of MCAR's MLS. A customer could only receive RPM's services if the customer already subscribed to the MLS. Thus, RPM's services augmented the MLS rather than replacing it, and RPM was not engaging in any true competition—fair or unfair—with MCAR.

**11.** MCAR Exh. 24 § III.

**12.** RPM also contends that any unauthorized copying of the MLS database constituted "fair use." This doctrine allows the use of copyrighted materials if the use satisfies a four-part test. The Court must consider (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the

■ The unfair competition claim arises under 15 U.S.C. § 1125(a)(1), which provides in relevant part:

Any person who, on or in connection with any goods ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ...

shall be liable in a civil action....

■ As the statute makes clear, "the test for unfair competition claims ... is whether there is a likelihood of confusion." *Scotch Whisky Ass'n v. Majestic Distilling Co.*, 958 F.2d 594, 597 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 181, 121 L.Ed.2d 126 (1992). To determine whether a likelihood of confusion exists, the Court must consider: (1) the strength or distinctiveness of the mark; (2) the similarity of the two marks; (3) the similarity of the goods or services the marks identify; (4) the similarity of the facilities the two parties use in their businesses; (5) the defendant's intent; and (6) actual confusion. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 933, (4th Cir.1995); *Pizzeria Uno v. Temple,* 747 F.2d 1522, 1527 (4th Cir.1984). Not all factors carry equal relevance, nor do all factors apply to every case. *Pizzeria Uno,* 747 F.2d at 1527.

copyrighted work. 17 U.S.C. § 107. Because RPM only offered evidence on the fourth factor, RPM has failed to carry its evidentiary burden. The Court shall therefore reject RPM's "fair use" argument.

**13.** MCAR has not registered any of these marks. Registration of the marks, however, is not a prerequisite for protection under 15 U.S.C. § 1125. *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992).

■ "The first and paramount factor ... is the distinctiveness or strength of the two marks." *Id.* at 1527. If a mark is not distinctive, the Lanham Act cannot protect it. *Two Pesos, Inc. v. Taco Cabana, Inc.,* — U.S. ——, ——, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). "[A]n identifying mark is distinctive and capable of being protected if it *either* (2) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Id.* at ——, 112 S.Ct. at 2758 (emphases in original). "Secondary meaning" generally means that "a mark or dress 'has come through use to be uniquely associated with a specific source.'" *Id.* at —— n. 4, 112 S.Ct. at 2756 n. 4 (quoting Restatement (Third) of Unfair Competition § 13, Comment e (Tent.Draft No. 2, Mar 23, 1990)). "'To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.'" *Id.* at —— n. 4, 112 S.Ct. at 2756 n. 4 (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 851, n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982)).

■ To aid in determining the distinctiveness of a mark, courts place trademarks into one of four categories: generic, descriptive, suggestive or "arbitrary or fanciful." *Id.* at ——, 112 S.Ct. at 2757 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976)). The categories make up a continuum of distinctiveness, with "generic" marks as the least distinctive and "arbitrary or fanciful" marks as the most distinctive. *Ibid.*

■ The Court concludes that the phrases "the Association" and "the Board" constitute "descriptive" marks at best. "Marks which are merely descriptive ... are not inherently distinctive." *Two Pesos,* — U.S. at ——, 112 S.Ct. at 2757. The first factor therefore weighs against a likelihood of confusion for these two marks.

■ The marks "MCBR" and "MCAR" may constitute either descriptive or suggestive marks. Although drawing a distinction between the two categories presents substantial difficulties, courts have provided some guidance. "Generally speaking, if the mark imparts information directly, it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." *Pizzeria Uno,* 747 F.2d at 1528 (quoting *Union Carbide Corp. v. Ever–Ready, Inc.,* 531 F.2d 366, 379 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976)).

"MCBR" and "MCAR" are merely abbreviations for "Montgomery County Board of Realtors" and "Montgomery County Association of Realtors," respectively. Because the abbreviations impart information about MCAR directly, without requiring imagination, they constitute descriptive marks. *See* 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* §§ 7.02[2], 11.13 (1993) and cases cited therein. MCAR has not argued, nor has it proven, that these marks have acquired a secondary meaning that would make them distinctive. As with the other two marks, the first factor suggests little likelihood of confusion arising from RPM's use of these marks.

Second, the Court must consider the similarity of the two marks. Because neither party contests that RPM's software produced MCAR's marks, the Court shall find that this factor weighs in favor of finding a likelihood of confusion.

Third, the Court weighs the similarity of the goods and services the marks identify. RPM essentially adds onto MCAR's MLS service. Thus, some confusion may arise between RPM's services and MCAR's services.

Fourth, the Court considers the similarity of the facilities the two parties use in their businesses. Both RPM and MCAR use the realtors' computers in their business. This factor therefore weighs in favor of a likelihood of confusion.

Fifth, the Court weighs the defendant's intent. The record contains no direct evidence that RPM intended to confuse its customers. In fact, the contract between RPM and its customers states that RPM "is not affiliated with any Board of Association of

REALTORS." [14] The other factors discussed above, however, may constitute circumstantial evidence of defendant's intent. For the purposes of the present summary judgment motions, the Court finds that the issue weighs against a finding of a likelihood of confusion.

Finally, the Court must consider whether anyone was actually confused. MCAR has submitted evidence that Frederick Thoms, a former MCAR member believed that RPM accessed the MLS with MCAR's blessing.[15] This statement, together with RPM's affidavits above, shows that RPM's use of MCAR's marks actually confused at least one person.

To counter MCAR's claims, RPM has submitted affidavits from several realtors.[16] The realtors state that they "do not see any likelihood that MCAR members would confuse the RPM services with the MCAR services." [17] These affidavits contradict MCAR's claim sufficiently to establish a genuine issue of fact as to whether a likelihood of confusion exists between RPM's services and MCAR's services. *See Lujan,* 497 U.S. at 888–889, 110 S.Ct. at 3188–3189 (non-moving party in summary judgment motion must produce "at least one sworn averment" of a disputed fact).

Taking these factors together, and weighing each factor appropriately, *see Pizzeria Uno,* 747 F.2d at 1527, the Court finds that there exists a genuine dispute of material fact as to whether a likelihood of confusion existed as to RPM's use of MCAR's marks. Most significantly, the weakness of MCAR's marks weighs against a likelihood of confusion. Also, the conflicting testimony each party presents advises against finding a likelihood of confusion in a summary judgment motion context. Accordingly, the Court shall deny both parties' motions for summary judgment on the issue of RPM's use of

MCAR's marks "the Association" "the Board," "MCBR" and "MCAR."

### b. *Passing Off*

 MCAR also claims that RPM misappropriated MCAR's marks and MLS data to "pirat[e] ... the fruits" of MCAR's labors. Essentially, MCAR alleges that RPM is "passing off" MCAR's labors, especially the MLS database, as its own, and thereby violating the Lanham Act.

As with the trademark claim, the Court must determine the likelihood of confusion. 15 U.S.C. § 1125(a). Such confusion constitutes "an 'inherently factual' issue that depends on the facts and circumstances of each case." *Lone Star,* 43 F.3d at 933 (quoting *Anheuser–Busch, Inc. v. L & L Wings, Inc.,* 962 F.2d 316, 318 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992)).

As detailed above, both parties have submitted affidavits showing that RPM's practices either could or could confuse RPM's customers. As above, the Court finds the issue disputable and will therefore find that this factor advises against granting summary judgment for either party on the issue of "passing off." [18]

### 3. *MCAR's Wiretapping Charge*

 MCAR brings the next motion under the Federal Communications Act. Essentially, MCAR alleges that RPM intercepted MCAR's transmissions to the realtors and divulged the transmission by viewing it, thereby violating 47 U.S.C. § 605. In pertinent part, that section provides:

> [N]o person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, pur-

---

**14.** Def. Mot. for Summary Judgment Exh. 9 § III.

**15.** Thoms Depo. at 187–88, MCAR Exh. 19A.

**16.** Def. Mot. for Summary Judgment Exh. 3–4, 10–11.

**17.** Def. Mot. for Summary Judgment Exh. 3–4, 10–11.

**18.** RPM's customers were sophisticated realtors associated with MCAR and knowledgeable about the MLS. RPM marketed its services as a supplement to the MLS. It therefore appears probable that the factfinder would conclude that RPM's customers were not likely to be confused by RPM's use of MCAR's marks. Nonetheless, as discussed in the text, this constitutes an issue for a jury to decide.

port, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination.... No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.

47 U.S.C. § 605(a).

A review of the relevant facts discloses the flaw in MCAR's claim. As discussed above, the realtors allowed RPM to access MCAR's database using the realtors' passwords. RPM thus acted as the agent of the realtors who used RPM's services. As the Supreme Court held almost 38 years ago, "The clear inference [from the statute] is that one entitled to receive the communication may use it for his own benefit or have another use it for him." *Rathbun v. United States*, 355 U.S. 107, 110, 78 S.Ct. 161, 163, 2 L.Ed.2d 134 (1957). Here, the realtors had RPM use MCAR's communication for the realtors' benefit. The case would differ in no way if, instead of allowing RPM to download the messages, a realtor had allowed RPM to view MCAR's listings one by one as the realtor viewed them on the computer monitor. *Cf. id.* at 110–11, 78 S.Ct. at 163–64. Because MCAR has not established that RPM has impermissibly "intercepted" MCAR's transmissions in violation of 47 U.S.C. § 605, the Court shall deny summary judgment for MCAR and grant summary judgment for RPM on this matter.

### 4. Misappropriation of Trade Secrets

Next, MCAR claims that RPM is misappropriating its trade secrets and requests a preventative injunction. The Court shall deny the request.

The Maryland Uniform Trade Secrets Act, Md.Com.Law II Ann.Code § 11–1201 (1990), defines a "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique or process, that: (1) derives independent economic value ... from not being generally

known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Md.Com.Law II Ann.Code § 11–1201(e).

Thus, to be protected under Maryland law, information must be secret, and its value must derive from the secrecy. In addition, the owner of the information must use reasonable efforts to safeguard the confidentiality of the information.

MCAR can satisfy none of these criteria. The information in the MLS database is not a secret; to the contrary, it is distributed widely to its realtor members and potential purchasers. The data derives economic value not from its secrecy, but from being widely distributed so potential purchasers will know what properties are on the market and obtain a description of those properties.

The widespread knowledge of the contents of the MLS database deprives the MLS of its claim to secrecy. Rather, this claim is properly understood as another way of asserting the copyright claim. Under these circumstances, the Court refuses to allow MCAR to shoehorn its copyright claim into Maryland's Trade Secrets Act. The Court shall accordingly deny MCAR's motion for summary judgment and grant RPM's motion for summary judgment on this issue.

### B. MCAR's Motion to Strike

After the primary briefing of the issues discussed above, MCAR filed a motion to strike portions of RPM's Reply to MCAR's Opposition to Defendant's Motion for Summary Judgment. MCAR argues that the reply brief improperly raises issues not previously addressed. Therefore, MCAR maintains, the Court should hold that RPM waived the arguments it did not present previously. MCAR cites no cases in support of their argument.

A few observations overcome MCAR's assertions. First, most of the issues of which MCAR complains are legal arguments, not factual issues. Because the Court may grant

summary judgment on any legal ground the record supports, 6 James W. Moore, Walter J. Taggart and Jeremy C. Wicker, *Moore's Federal Practice* ¶ 56.14[1] (1994), MCAR's objections are unavailing. Second, RPM correctly notes that it had in fact previously asserted most of the arguments and defenses in the Reply brief. Third, the Court in its discretion may consider any material it considers helpful in determining a matter before it, including new legal arguments. *See* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1189 (1990). Finally, the disposition of the above claims relies negligibly, if at all, upon the legal claims RPM raises in its reply brief. The Court shall therefore deny the motion to strike.

### C. *RPM's Motion for Summary Judgment*

#### 1. *Breach of Contract*

 RPM has asked for summary judgment on MCAR's breach of contract claim. In the claim, MCAR alleges that RPM agreed to develop certain software programs for MCAR. The software proved defective, according to the complaint, and RPM has allegedly refused to fix it. MCAR alleges breach of contract and breach of the implied warranty of fitness for a particular purpose.

The uncontradicted testimony of Scott Landrum, MCAR's director of computer and data processing services, shows that Hemreck delivered the software package in accordance with the contract, and that David Marple, a MCAR employee, somehow destroyed the software.[19] Landrum's uncontradicted testimony also shows that MCAR's refusal to give RPM access to MCAR's computer prevented RPM from servicing the software.[20]

 The letter agreement between MCAR and RPM states that RPM would install the software "[w]ith [MCAR's] participation." [21] In other words, RPM's promise to install the software depends upon MCAR's participation; each promise is a "constructive condition" of the other. *See* E. Allan Farns-

worth, *Contracts,* 2d ed. § 8.8 (1990) ("Farnsworth"). Black-letter case law dictates that "if one party's performance is a constructive condition of the other party's duty, only 'substantial' performance is required of the first party. . . ." Farnsworth § 8.12.

Here, after a MCAR employee destroyed the software, MCAR did not participate with Hemreck in the installation of replacement software as required by the contract. Nowhere does MCAR dispute that Hemreck put forth his best efforts to install the software, but he was stymied by his own computer malfunctions and Landrum's refusal to allow Hemreck to use MCAR facilities. Whether RPM's performance of the contract was "substantial" under the circumstances is a question of fact to be determined by a jury. *E.g., Jacob & Youngs, Inc. v. Kent,* 230 N.Y. 239, 129 N.E. 889, 891 (1921) (Cardozo, J.); Farnsworth § 8.12. The Court shall therefore deny RPM's motion for summary judgment on the breach of contract and breach of warranty claims.

#### 2. *RPM's Antitrust Claims*

#### a. *MCAR's Copyright Claim as a Restraint of Trade*

RPM's antitrust claim against MCAR and Shannon alleges that by refusing RPM access to the MLS, MCAR and Shannon are unreasonably restraining trade in violation of the Sherman Act, 15 U.S.C. § 1 *et seq.* MCAR and Shannon have each requested summary judgment on this claim.

 To establish a Sherman Act violation, a plaintiff must demonstrate: (1) a contract, combination or conspiracy among two or more persons, (2) that unreasonably restrains trade, and (3) affects interstate commerce. 15 U.S.C. § 1. Because the Court has previously determined that RPM has satisfied the third element, *MCAR,* 783 F.Supp. at 958 n. 19, the Court shall not revisit this issue again.

 MCAR and Shannon argue that RPM has failed to show the first requirement. Citing *Copperweld Corp. v. Indepen-*

---

**19.** Landrum Depo. at 49.

**20.** Landrum Depo. at 50.

**21.** Compl. Exh. D.

*dence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), among other cases, they argue that MCAR, as an association, cannot conspire with itself, and therefore cannot violate the Sherman Act.

The cases cited, however, concern corporations and their subsidiaries, rather than professional or trade associations like MCAR. *E.g., Copperweld*, 467 U.S. at 755, 104 S.Ct. at 754. Courts have generally held that associations, being "a group of persons or entities which have joined together for a common purpose," Earl W. Kintner, 2 *Federal Antitrust Law* § 9.16 (1980) ("Kintner"), can form the requisite conspiracy under the Sherman Act. *E.g., Volvo N. Amer. v. Men's Int'l Professional Tennis Council*, 857 F.2d 55, 70–71 (2d Cir.1988); *Daniel v. Amer. Bd. of Emergency Medicine*, 802 F.Supp. 912, 924–25 (W.D.N.Y.1992); *see generally* Kintner § 9.16. This Court finds this line of cases persuasive and accordingly holds that an association can by itself form a conspiracy.

■ Next, RPM must establish that MCAR's actions unreasonably restrained trade. To satisfy this requirement, RPM contends that MCAR's institution of the present suit constitutes an act by MCAR to restrain trade unreasonably.

That MCAR seeks to enforce its copyright in court, however, does not in itself violate the antitrust laws. *E.g., Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 161 (3d Cir.1984); *Drop Dead Co. v. S.C. Johnson & Son, Inc.*, 326 F.2d 87, 96 (9th Cir.1963), *cert. denied*, 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 177 (1964); *Blue Cross v. Group Hospitalization & Med. Serv.*, 744 F.Supp. 700, 719 (E.D.Va.), *aff'd without opinion*, 911 F.2d 720 (4th Cir.1990). As the Supreme Court has observed,

> [I]t would be destructive of rights of association and of petition to hold that groups ... may not, without violating the antitrust laws, use the channels and procedures of ... courts to advocate their causes and points of view respecting reso-

lution of their business and economic interests *vis-a-vis* their competitors.

*California Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972). Accordingly, the Court holds that MCAR's copyright infringement suit does not violate the Sherman Act.

### b. *Concerted Refusals to Deal*

■ Alternatively, RPM asserts that MCAR's refusal to allow RPM access to the MLS amounts to a concerted refusal to deal. The law defines the typical concerted refusal to deal, or "group boycott," as "a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level." *Smith v. Pro Football, Inc.*, 593 F.2d 1173 (D.C.Cir.1978). *See, e.g., Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).[22]

In the real estate context, courts have recognized a refusal to deal when realtors exclude competitors from the real estate association. Such action deprives the excluded realtor from access to the association's multilist database, thereby placing the realtor at a decided competitive disadvantage.

In *United States v. Realty Multi–List, Inc.*, 629 F.2d 1351 (5th Cir.1980), the Fifth Circuit applied this theory. The court considered whether the membership criteria promulgated by the defendant realtors' association violated the Sherman Act by unreasonably restraining competition. *Id.* at 1354. The court held that the association's largely subjective membership criteria unreasonably restrained commerce by unfairly excluding potential members. *Id.* at 1382, 1389. *See also Northwest Real Estate Bd. v. Multiple Listing Service of N. Illinois, Inc.*, No. 90–C–6015, 1991 U.S.Dist. LEXIS 11809 (N.D.Ill., August 22, 1991).

---

**22.** *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) stands as the classic refusal to deal. There, Broadway–Hale, a chain department store, threatened that it would stop purchasing from certain suppliers if they continued to sell to Klor's, a small competitor. Some of the suppliers capitulated, thereby depriving Klor's of inventory to sell.

This theory cannot apply here. RPM never sought to become a member of MCAR, and MCAR never refused RPM membership. Further, RPM did not compete with MCAR's realtor members. Rather, as stated above, MCAR refused to allow RPM to copy its database, a refusal the copyright laws allow. 17 U.S.C. § 106 (granting copyright owner the "exclusive right" to "reproduce the copyrighted work"). The antitrust laws do not impose upon MCAR the duty to give RPM its copyrighted database for free to allow RPM to compete with it more effectively.[23] *Cf. Olympia Equipment Leasing v. Western Union Telegraph Co.,* 797 F.2d 370 (7th Cir.1986), *cert. denied,* 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987) (company has no duty to help competitors).[24] The activities RPM alleges do not amount to a concerted refusal to deal.

### c. The Essential Facilities Doctrine

As a final resort, RPM seeks to fix antitrust liability upon MCAR and Shannon by citing the "essential facilities" doctrine. To rely on the doctrine, RPM must show: (1) control by the defendant of the essential facility; (2) the inability of the competitor seeking access to practically or reasonably duplicate the facility; (3) the denial of the facility to the competitor; and (4) the feasibility of the monopolist to provide the facility. *Laurel,* 924 F.2d at 544.[25]

This doctrine is probably the most germane of the antitrust doctrines RPM advances. Making the required showings would have presented little apparent difficulty, given that MCAR freely concedes that it owns the admittedly essential facility and that it refuses RPM access to the facility.

As with its other antitrust claims, however, RPM has utterly failed to bring forward evidence establishing the elements of the essential facility rule. Instead, RPM devotes only one page of its 25-page summary judgment motion to the issue, and the analysis consists of the naked claim, unsupported by specific facts, that the MLS is an essential facility. The argument contains only three cases, all of which carry at best marginal relevance, and only one of which was decided in the past fifty years.

RPM's most significant evidentiary omission is its failure to offer any evidence showing that it cannot practically duplicate the MLS. As stated above, making the required showing might have presented few obstacles, but because RPM has not attempted to do so, the Court cannot refuse MCAR's and Shannon's request for summary judgment on this claim.[26]

In summary, MCAR's refusal to allow RPM to download the MLS does not restrain

---

**23.** To prove a concerted refusal to deal, RPM must offer proof that no legitimate business purpose existed for MCAR's refusal to sell RPM the database. *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.,* 924 F.2d 539, 542 (4th Cir.), *cert. denied,* 502 U.S. 814, 112 S.Ct. 64, 116 L.Ed.2d 39 (1991); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.") To do this, RPM must first establish that MCAR had a conscious commitment to a common scheme designed to achieve an unlawful objective. *Laurel,* 924 F.2d at 543. Second, RPM "must bring forward evidence that excludes the possibility that the alleged coconspirators acted ... based upon a legitimate business purpose." *Ibid.* RPM's failure to offer evidence to support its claim also condemns its group boycott claim.

**24.** Limits upon the uses of a copyright exist. For example, a tying arrangement would violate the antitrust laws regardless of the existence of a copyright. The Court, however, has rejected RPM's previous tying claim, *see MCAR,* 783 F.Supp. at 959–963, and declines RPM's invitation to revisit the issue.

**25.** In the early part of this century, the Supreme Court formulated and applied the essential facilities doctrine to prevent one company from owning every railroad track leading into the city of St. Louis. *United States v. St. Louis Terminal R.R. Assoc.,* 224 U.S. 383, 410–11, 32 S.Ct. 507, 515–16, 56 L.Ed. 810 (1912). More recently, MCI used the doctrine to compel AT & T to allow it access to its telephone lines. *MCI Communications v. Amer. Tel. and Tel. Co.,* 708 F.2d 1081, 1132–33 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

**26.** If RPM should wish to revive this issue, the Court would require it to file a substantive motion seeking leave to do so.

trade unreasonably. Rather, it seems like a legitimate attempt by MCAR to protect and enforce its copyright. Moreover, RPM's failure to offer evidence supporting its antitrust claims mandates the entry of summary judgment for MCAR and Shannon on the federal antitrust issue.

### 3. *The Maryland Antitrust Claim*

In addition to the federal antitrust action, RPM brought an action, alleging the same facts, under Maryland's antitrust statute, Md.Com.Law Code Ann. § 11–204(a). The Maryland statute follows the Sherman Act closely, and Maryland courts look to federal interpretations of the Sherman Act for guidance in construing the state law. *Cavalier Mobile Homes v. Liberty Homes, Inc.*, 53 Md.App. 379, 454 A.2d 367, 371 (1983). Because the above analysis of the Sherman Act claim governs the Maryland antitrust claim, the Court shall similarly grant summary judgment for MCAR and Shannon on the Maryland antitrust claim. *See Neugebauer v. A.S. Abell Co.*, 474 F.Supp. 1053, 1071 (D.Md.1979).

### 4. *Tortious Interference with Contractual Relations*

 Next, RPM claims that MCAR tortiously interfered with its contractual relations with its customers. RPM bases this claim upon MCAR's communications to RPM's customers and potential customers (*i.e.*, MCAR members), discussing alleged violations of MCAR's copyrights and related issues. RPM says that these communications "obviously damaged RPM's reputation and standing. . . ." [27]

"[A] third party who, without legal justification, intentionally interferes with the rights of a party to a contract, or induces a breach thereof, is liable in tort to the injured contracting party." *Wilmington Trust Co. v. Clark*, 289 Md. 313, 424 A.2d 744, 754 (1981). The above definition shows that RPM has failed to establish its claim in two ways.

First, the tort of contractual interference requires that the defendant have acted "without legal justification." *Id.* 424 A.2d at 754.

Notifying customers of an alleged copyright infringement in good faith does not constitute tortious interference with contractual relations. *Lake Shore Investors v. Rite Aid Corp.*, 67 Md.App. 743, 509 A.2d 727, 732 n. 4 (1986) (giving legal advice which causes a person to cancel contract not actionable); *Shapiro & Son Bedspread Corp. v. Royal Mills Assoc.*, 764 F.2d 69, 75 (2d Cir.1985); Similarly, MCAR's good-faith institution of a lawsuit is legitimate business, not contractual interference. *Orfanos v. Athenian, Inc.*, 66 Md.App. 507, 505 A.2d 131, 139–140 (1986).

Second, RPM has failed to offer evidence showing that anyone failed to perform their contract in response to MCAR's communications. Without evidence that MCAR's communications caused a RPM customer to cancel their contract, a cause of action for tortious interference with contractual relations cannot lie. *Lake Shore Investors*, 509 A.2d at 732.

RPM has not come forward with evidence showing a cause of action for tortious interference with contractual relations under Maryland law. Accordingly, the Court shall grant MCAR's motion for summary judgment on this issue.

### 5. *RPM's Defamation Claim*

RPM claims that MCAR officers John Gilbert, George Ballman and Harold Huggins defamed RPM by circulating newsletters and other written material to realtors that described the tensions between RPM and MCAR in a light unfavorable to RPM. First, RPM complains of the officers' statements that RPM's software infringed upon MCAR's proprietary rights and that Hemreck intended to misuse and misappropriate MCAR's proprietary data.[28] As to Ballman, RPM complains that Ballman stated that Hemreck "is taking copyrighted data and merging it with his pictures. He's capitalizing on our product." [29] With respect to John Gilbert and George Ballman, RPM claims that they stated that RPM misappropriated MCAR's proprietary information, that RPM attempted to access the MLS "in the middle of the

---

27. Def. Consolidated Motion at 22.

28. Counterclaim ¶ 194.

29. Counterclaim ¶ 199.

night using improper access code numbers," and that RPM was infringing upon MCAR's copyright.[30]

■ To establish a cause of action for defamation in Maryland, the plaintiff must prove (1) a defamatory communication; (2) falsity; (3) fault; and (4) harm. *Gooch v. Maryland Mechanical,* 81 Md.App. 376, 567 A.2d 954, 961 *cert. denied,* 319 Md. 484, 573 A.2d 807 (1990). Particularly, the plaintiff bears the burden of proving the falsity of the statement and that the defendant knows the statement is false. *Fitzgerald v. Penthouse Int'l Ltd.,* 639 F.2d 1076, 1079 (4th Cir.1981); *Gooch,* 567 A.2d at 961, 962. RPM has failed to sustain this burden.

■ As to the officers' alleged statements that RPM was infringing upon MCAR's copyright and proprietary interests, RPM has submitted no evidence that the statements were false. Given that the officers relied on the advice of counsel of making the statement, RPM would have faced considerable obstacles to making such a showing. Additionally, the above discussion of the copyright infringement claim shows that the statements may have been true.

RPM has similarly failed to show that Ballman's statements regarding RPM's copying of the database lacked veracity. As discussed above, the MLS receives copyright protection, as Ballman claimed. Second, RPM does not dispute that it was merging the MLS with its pictures, as Ballman stated. Finally, neither party disputes Ballman's assertion that RPM was making money from, or "capitalizing on," its use of the MLS. *See Webster's II New Riverside University Dictionary* (1994) (to "capitalize" is "[t]o use as or convert into capital," or "wealth"). In its summary judgment motion, RPM does not even mention Ballman's statement, much less provide evidence tending to show that it is untrue. RPM has therefore failed in its burden to demonstrate the falsity of Ballman's alleged statement.

The final allegedly defamatory statement requiring consideration is the statement that RPM was accessing the MLS in the middle of the night using improper access codes.

Neither party disputes that RPM was accessing the MLS. As to the remainder of the statement, RPM has offered no evidence that it is untrue. In fact, RPM's summary judgment motion ignores this statement in its entirety.

Most of RPM's summary judgment on the defamation claim apparently concentrates on the newsletters MCAR sent to its constituent realtors. The Court has reviewed the newsletters and finds considerable support for RPM's assertion that the newsletters place RPM in an unfavorable light. A negative portrayal, however, does not constitute a defamatory statement. As stated above, the statement must be false, and the plaintiff in a defamation suit must prove that the statement is false. Again, RPM has failed even to indicate which statements it considers false, much less to offer evidence tending to show that anything in the newsletter is false.

RPM's failure to offer evidence of the falsity of MCAR's alleged statements dooms its defamation claim. Accordingly, the Court shall grant MCAR's motion for summary judgment on the defamation claim by separate Order.

### III. CONCLUSION

For the reasons stated above, the Court shall, by separate Order:

DENY MCAR's motion for summary judgment to enjoin copyright infringement; MCAR's motion for summary judgment to enjoin unfair competition; MCAR's motion for summary judgment to enjoin unauthorized interception, disclosure and use of MLS database compilation communications; MCAR's motion for summary judgment to enjoin misappropriation of trade secrets; MCAR's motion for summary judgment to enjoin misappropriation of trade secrets; and MCAR's motion for summary judgment to enjoin unfair competition;

GRANT MCAR's motion for summary judgment on Counts I, II, and III of the counterclaim; MCAR's motion for summary judgment on Counts IV, V, VI, and VII of

---

**30.** Counterclaim ¶ 205.

the counterclaim; and Shannon's motion for summary judgment; and

GRANT IN PART AND DENY IN PART RPM's motion for summary judgment.